NATIONAL LABOR RELATIONS BOARD
v. UNITED HOISTING CO., Inc. et al.

No. 10677.

United States Court of Appeals
Third Circuit.

Argued May 23, 1952.

Decided Aug. 4, 1952.

Bernard Dunau, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Marshall J. Seidman, Washington, D. C., on the brief), for National Labor Relations Board.

William J. Corcoran, New York City (Levy, Galotta & Corcoran, New York City, on the brief), for respondent Union.

Harold L. Luxemburg, New York City, for respondent Company.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The Labor Board found that the employer and the union were guilty of an unfair labor practice by giving effect to an invalid union-security agreement which resulted in the discharge of an employee because of his refusal to join the union. Application is made by the Board under Section 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., for enforcement of its order.

The original agreement between the employer, acting through the Construction Equipment Rental Association and the union, was dated June 18, 1947—before the Taft-Hartley Act. It provided for priority employment to union members. Where union members were unavailable the employer was privileged to employ non-union workmen " * * * for a probationary period of not more than six weeks, and who shall comply during this probationary period with all requirements of Union membership. During this period if the employer determines to retain the employee, the Union hereby agrees to accept said employee as a member of its Union upon payment of its regular initiation fee, which shall not exceed $100." There was a provision for a union steward to monitor the terms of the agreement. The minimum time for termination of the agreement was fixed as December 31, 1948. On April 1, 1948, after the Taft-Hartley amendments to the Act, an addenda to the agreement was executed by the parties. By that addenda Article XI of the agreement which prohibit-

ed any change in the agreement until December 31, 1948, was amended to allow an immediate change; the term of the agreement was extended two full years to December 31, 1950; the hourly rates for mechanics and helpers were increased; stock clerks and storekeepers were eliminated from union membership entirely and the original agreement provision setting up a wage rate for such of that group as performed manual labor, was deleted. Certain other types of employees were eliminated from the terms of the agreement. The addenda stated that the original agreement was to continue " * * * in full force and effect" including the security provision except for the changes made.

There is testimony in the record to show that Huegel, the discharged employee, had been hired as a welder by the employer respondent on October 11, 1948. At that time Davidson, hiring foreman, explained to him the union-security clause of the agreement. In December, Huegel was told by the shop steward that he and three other new employees would be taken into the union after Christmas. Huegel said that on January 13, 1949, one of the new men above referred to told him that they were all to join the union that night. Huegel advised his foreman Davidson of this and inquired regarding his status as an employee. Huegel testified that the foreman told him it was "all right" and suggested that Huegel ride down to the union hall with the other candidates. The foreman denies this. On the point the Trial Examiner believed Huegel. Huegel did not go to the union hall that night and testified that the next day the shop steward asked him the reason for his non-attendance. Huegel replied that he had gone to a VFW meeting and said, "I believe I don"t have to join the union." The steward replied, "Well, we will see about that. You will be through tonight." According to Davidson the morning after the union meeting the shop steward told him that Huegel had not gone to the union meeting and said " * * * that he should probably be laid off." Davidson testified that he told Gerome R. White, the company vice-president and secretary, Huegel had not joined the

union. Davidson said that White made the decision to lay off Huegel on receipt of that information. White testified that after Davidson told him of Huegel's refusal, "* * I immediately said that it was a solution to our problem because of the fact that we had slackened up in our welding department." Huegel's evidence is that the afternoon of the same day Davidson came to him and said that he understood that he did not wish to join the union. Huegel assented to this and Davidson then advised him, " * * * this is a union shop. If you are not going to join the union, I will have to let you go for lack of work." That afternoon Huegel's wage check and separation notice marked "Lack of Work" were waiting for him.

In the light of the above evidence and upon the record as a whole the Trial Examiner found " * * * that the contention of the Respondents that Huegel was laid off because of lack of work is without merit." And therefore that "Everything considered, the undersigned is satisfied and finds that Huegel was discharged on January 14, 1949, rather than laid off, and that the motivating factor was Huegel's refusal to join the Union, rather than lack of work." The Board, reviewing this ruling, found that no prejudicial error had been committed and affirmed it. Our own examination of the record reveals substantial support for the finding. The contention of the union that, as a matter of law, the action of its shop steward, Paider, in requesting Huegel's discharge was not attributable to it is without merit and needs no discussion. The record reveals that the admission of testimony in connection with that episode was obviously not improper.

Respondents, though vigorously contending that Huegel was actually laid off solely because of lack of work, say that even assuming the situation as found by the Examiner, it would not be an unfair labor practice because though the type of union-security clause in the agreement involved was wiped out by the Taft-Hartley Act, the discharge pursuant to this particular clause was protected by Section 102 of that Act as " * * * the performance of * * *

[an] obligation under a collective-bargaining agreement entered into prior to the date of the enactment of this Act." [1] The date of the enactment of the Act was June 23, 1947. The date of the original agreement was June 18, 1947.

■ The Examiner recognized that the agreement was prior to the enactment date of the Labor Management Relations Act but held that the provisions of the addenda to the agreement of April 1, 1948 made substantial changes in the original agreement. It will be remembered that the duration clause was extended for two years by the addenda. The Examiner concluded that whether the addenda be considered as amending the agreement and reasserting it as amended or as a new contract, " * * * by executing the addenda about April 1, 1948, the Respondents removed the agreement of June 18, 1947, from the protection of Section 102 * * *." The Board upheld this view under its decision in The Broderick Company (Header-Press Division) 85 N.L.R.B. 708. We think that because of the changes made by the addenda to the original agreement, particularly the extension of its life (including the union-security clause) for two years beyond its fixed minimum expiration date, the original agreement was taken out of the protection of Section 102 in that it " ' * * * was renewed or extended.' " Following through on the respondents' theory that the addenda merely clarified certain terms of the original contract would lead to an unwarranted circumvention of the proscription in the Taft-Hartley Act against the type of union-security clause before us.

It is also contended that since the execution of the addenda occurred more than six months prior to the filing of the charge in this matter, the charge is barred by Section 10(b) of the Act. [2]

■ We do not think that conclusion justified. The Board very carefully refrained from making any unfair labor practice finding with respect to the execution of the addenda. Its decision is expressly founded upon the discharge of Huegel in the course of enforcement of the illegal union-security provision. Huegel filed his charge three days after his discharge. That charge did not spring from the execution of the addenda more than six months before but directly from the application by the respondents only three days previously of the unlawful security clause in consequence of which Huegel was discharged. The Board's reasoning is not contrary to our decision in National Labor Relations Board v. Pennwoven, Inc., 3 Cir., 194 F.2d 521, and is squarely in accord with Katz v. National Labor Relations Board, 9 Cir., 196 F.2d 411, 415, where the court answered the identical contention by saying, " * * * there is no doubt but that the continuous enforcement of the agreement thereafter within the six months period

1. Section 102 of the Act, 61 Stat. 152, 29 U.S.C.A. note following Section 158 provides:

" 'No provision of this title shall be deemed to make an unfair labor practice any act which was performed prior to the date of the enactment of this Act (June 23, 1947) which did not constitute an unfair labor practice prior thereto, and the provisions of section 8(a) (3) and section 8(b) (2) of the National Labor Relations Act as amended by this title shall not make an unfair labor practice the performance of any obligation under a collective-bargaining agreement entered into prior to the date of the enactment of this Act, or (in the case of an agreement for a period of not more than one year) entered into on or after such date of enactment, but prior to the effective date [August 22, 1947] of this title, if the performance of such obligation would not have constituted an unfair labor practice under section 8(3) of the National Labor Relations Act prior to the effective date of this title, *unless such agreement was renewed or extended subsequent thereto.*' " (Emphasis supplied).

2. 61 Stat. 146, 29 U.S.C.A. § 160(b). " * * * Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, * * *."

prior to the filing of the charge, was an unfair labor practice, and with respect to this continued and continuous enforcement of the illegal union shop agreement, the prosecution of the proceeding was not barred by limitations. Superior Engraving Co. v. N. L. R. B., 7 Cir., 1950, 183 F.2d 783, 790, certiorari denied .340 U.S. 930, 71 S.Ct. 490, 95 L.Ed. 671." The necessary consequence of the adoption of respondents' theory would be that present enforcement of a confessedly illegal union shop agreement could proceed with impunity just as long as the agreement itself had been executed beyond the statutory six months period.

Respondents argue that the assignment of a legal assistant to a Board member to try this case violated the Act.

The Board's decision with respect to this was that, "We find no merit in this exception as, at the time of the hearing, the legal assistant had been transferred to the staff of the General Counsel in the Regional Office; was under the general supervision of the General Counsel, as required by Section 3(d) of the Act; and at no time thereafter participated, advised, or assisted in the decision in this case." A letter from the acting executive secretary of the National Labor Relations Board replying to an inquiry of counsel for the respondent union on this subject is printed in respondents' joint appendix and referred to in respondent union's brief. The brief states that the union learned that Mr. Welles, the assistant referred to, " * * * had been detailed for a period of about one month to the New York Regional Office, to try this case." The letter states that, "The purpose of this detail was to acquaint legal assistants to Board Members with field practice and thus render better service to parties coming before the Board because of a fuller knowledge of their problems."

Clearly there was no violation of the Act by the Board in this incident. During his training period with the General Counsel Mr. Welles had been expressly divorced from his work with the Board. He was completely under the direction of the General Counsel. Neither in fact nor in purpose was there any combination of judicial and prosecuting functions. In a laudable effort to give their assistants a rounded out experience so that they would be able to render better service to parties coming before the Board, the latter body arranged for the sort of detached trial assignment under the General Counsel which Mr. Welles was given in this matter. In so doing the Board functioned with the highest sense of responsibility for its obligations under the Act.

Finally it is argued by the respondent employer that the Construction Equipment Rental Association should have been given notice of the proceeding below.

The Association, it will be recalled, was the employers group with whom the agreement of June 18, 1947 and the addenda of April 1, 1948 were made. The original agreement was signed for the Association by its president, E. A. White who then as now also served as president of the employer respondent. In 1948 his company, the employer respondent, had continued as a member of the Rental Association. White said that he considered the company bound by the provisions of the addenda. He did not think that he had any position with the Association in 1948 nor did he hold any position with the Association at the time he appeared as a witness in the trial below in April 1950.

The objection to lack of notice to the Association is here raised for the first time. No reason is given in explanation of failure to mention it to the Examiner or to the Board. At that time, formal notice, if any was required, could have been readily given to the Association. At this stage of the proceeding Section 10(e) of the Act, under the facts, definitely bars us from consideration of this unimportant objection.

A decree enforcing the Board's order will be entered. Counsel for the Board will submit a form of decree.