**NATIONAL LABOR RELATIONS BOARD**

v.

**TEXTILE MACHINE WORKS, Inc.**

No. 11204.

United States Court of Appeals, Third Circuit.

Argued March 18, 1954.

Decided July 14, 1954.

**930**

Frederick U. Reel, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Melvin Pollack, Attorneys, National Labor Relations Board, Washington, D.C., on the brief), for petitioner.

Geoffrey J. Cunniff, Philadelphia, Pa., (Joseph S. Kleinbard, Robert John Brecker, Philadelphia, Pa., Kleinbard, Bell & Brecker, Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, Chief Judge, and MARIS and STALEY, Circuit Judges.

BIGGS, Chief Judge.

The National Labor Relations Board has petitioned this court to enforce an order issued by it against the respondent, Textile Machine Works, Inc. The jurisdiction of this court is based upon Section 10(e) of the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C.A. § 141 et seq. The principal question of law which we must decide is the effect of that proviso of Section 10(b) of the Act, which requires unfair labor practice charges to be filed and served no later than six months after the alleged unfair labor practice occurs.[1] A similar question was involved in two recent decisions, one by this court, N.L.R.B. v. Pennwoven, Inc., 1952, 194 F.2d 521 and one by the Court of Appeals for the Second Circuit, N.L.R.B. v. Childs Co., 1952, 195 F.2d 617. Our decision is governed largely by these two precedents.

On August 1, 1947 a strike occurred in Textile's plant at Wyomissing, Pennsylvania. The strike ended about September 3, when the strikers' negotiating committee came to see Textile's employment manager, Fleischmann, to arrange for the strikers to go back to their jobs. The employment manager told them that the strikers should sign an employment register maintained by Textile under his immediate charge and that he would notify them when to come back to work. They complied with his instructions, signed the register and left the plant.

---

1. "Provided, that no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *." 29 U.S.C.A. § 160(b).

On September 6 and October 15, 1947, Textile discharged approximately 200 former employees, all of whom had been strikers. The respondent sent registered letters to each of the 200, notifying them that their employment with the company had been terminated. Most of this group of 200 asked the respondent for reemployment at various times after they had been discharged, but none was rehired.

The first unfair labor practice charge was filed with the Board on September 8, 1948, more than a year after the end of the strike. This first charge named 70 former employees as having been subjected to unfair labor practices. A subsequent charge was filed on July 22, 1949 and two more on January 12, 1950. The total number of former employees named in all four charges was 212. The Board's General Counsel consolidated the charges into a formal complaint filed on June 5, 1950. 85 former employees selected from the 212 named in the charges were named in the complaint.[2] All of these 85 were strikers and were among the 200 employees who had been discharged on September 6 and October 15, 1947.

The complaint charges that the respondent refused "to employ or to reinstate" the former employees named therein because they had been active in a labor organization and in efforts at collective bargaining, in violation of Sections 8(a) (1) and 8(a) (3) of Act, 29 U.S.C.A. § 158(a) (1) and (a) (3). The law is now settled that a refusal to hire on account of past union activity is a violation of the cited sections of the Act. See Phelps Dodge Corp. v. N. L. R. B., 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271. In the instant case the usual administrative process began after the complaint was filed. Extensive hearings were held. The trial examiner who conducted them made an "Intermediate Report" in which he recommended that 83 of the 85 former employees named in the complaint as amended be offered "immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority and other rights and privileges * * *" with payment "* * * of a sum of money equal to that which they would have earned as wages from the date of discriminatory refusal to rehire to the date of offer of reinstatement." After Textile excepted to the findings and conclusions of the trial examiner the Board entered its own decision and order on November 5, 1951. This order modified the trial examiner's recommendation and required the respondent to offer to all 85 former employees "immediate employment with such seniority or other rights and privileges as each would have enjoyed had each been employed on the dates when, absent the Respondent's discrimination against them, the Respondent would have employed them in accordance with its nondiscriminatory hiring practices." See 96 N.L. R.B. 1333 at p. 1364. No further action was taken in the case until after the decisions in the Pennwoven and Childs cases, supra. After these opinions were handed down the Board undertook to reexamine its own decision in the light of the opinions filed by the Court of Appeals for the Second Circuit and by this court. In a Supplemental Decision and Order, filed on June 17, 1953, the Board concluded that the evidence in the record, read in the light of the Pennwoven and Childs opinions, still supported its original order as to 84 of the 85 former employees. It should be noted that the Board's order does not require Textile's designated former employees to be reinstated as if they had never ceased working for Textile. The remedy awarded the employees was limited to back pay and seniority rights to which they, the employees, would have been entitled if they had been employed for the first time when a vacancy occurred after they applied for reemployment.

---

2. The complaint was amended during the hearings to add one name, making 86, and to drop one man originally named in the complaint, restoring the number of names in the complaint to the original 85.

As has been stated, the first unfair labor practice charge was not filed with the Board until September 8, 1948, over a year after the strike and ten months after the respondent mailed the discharge letters. The proviso in Section 10(b) of the Act, quoted in footnote 1, supra, requires that charges be filed no more than six months after the unfair labor practice occurs. Therefore, if Textile committed any unfair labor practice in *discharging* the 84 employees named in the order which the Board now seeks to enforce, that unfair labor practice is now barred by passage of time. The General Counsel apparently recognized this for the complaint does not allege an unfair labor practice based on discharge but only on a refusal "to employ or to reinstate" the former employees. The complaint fixes the date of the refusal to employ or reinstate as the period "beginning on or about March 20, 1948", within six months before the first charge was filed.

■■ In Pennwoven this court distinguished between an application for reinstatement by a discharged employee and an application for new employment. The distinction is critical in dealing with cases involving the six month limitation provided by Section 10(b) for the following reason. A discharged employee who seeks to be *reinstated* is really litigating the unfairness of his original discharge because only if the original discharge was discriminatory is he entitled to be reinstated as if he had never ceased working for the employer. The word *reinstatement* must be employed in this connection as the equivalent of uninterrupted employment. In this sense, the employee is restored to all of the rights and privileges which were his before he was discharged, plus any new rights and privileges which would have accrued to him in the meantime. Compare the "escalator" concept used in reinstating vet-

erans in their former positions under the Universal Military Training Act of 1951, 65 Stat. 75, 50 U.S.C.A.Appendix § 459. See Diehl v. Lehigh Valley Railroad Co., 3 Cir., 1954, 211 F.2d 95. The concept of a discriminatory refusal to hire is a different concept. If a person— whether a former employee or not—applies for employment and discriminatorily is refused employment on account of prior union activity, the employer has committed a separate and distinct unfair labor practice. See Phelps Dodge Corp., Inc. v. N. L. R. B., supra. And the separate unfair labor practice of refusal to hire occurs when another applicant for employment is hired instead of the applicant discriminated against. Cf. N. L. R. B. v. Pennwoven, supra, 194 F.2d at page 526 (concurring opinion).

■ We therefore have to decide whether the evidence in the record supports the conclusion of the Board that each of the 84 employees covered by the present petition had applied for jobs as new employees and that Textile committed the unfair labor practice of discriminatorily refusing to hire them after March 8, 1948, six months before the first charge in this case was filed.[3] Our review of the Board's order is limited to determining whether the Board applied the correct principles of law and whether upon a review of the whole record there is substantial evidence to support the Board's decision. See Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

In its Supplemental Decision and Order the Board in general correctly applied the law as it had been declared in Pennwoven and in Childs. The Board accepted the distinction which had been made between an application for reinstatement and an application for new employment and applied that distinction in the main correctly to the facts as they were developed in the record before it.

3. The six month period dates back from the filing of the first charge as to all 84 employees in spite of the fact that only 68 of the 84 were named in the first charge. Cf. Cathey Lumber Co., 1949, 86 N.L.R.B. 157, affirmed 5 Cir., 1951, 185 F.2d 1021; N. L. R. B. v. Dinion Coil Co., 2 Cir., 1952, 201 F.2d 484, 491; N. L. R. B. v. Kingston Cake Co., 3 Cir., 1951, 191 F.2d 563, 567.

The Board concluded that the record sustained the charge of an unlawful refusal to hire 84 former employees.

In its Supplemental Decision and Order the Board found that 84 of the 85 former employees named in the complaint as amended actually applied to the respondent for employment as new employees. This is the crucial fact finding, because if the former employees did not apply as new employees but wanted only to be "reinstated", *veritably* they were not asking for new employment at all. Textile could not be guilty of unfair labor practices in refusing the employees something which they had not in fact asked for.

83 of the 85 former employees named in the complaint testified at the hearing. 84 of the 85 had applied for reemployment in person; one, Angelo Tomeo, had written a letter referred to hereinafter. As might be expected, so many separate recollections of different conversations with Textile's employment manager and other executives resulted in wide variations in testimony. In his letter Tomeo, however, made it clear that he was demanding reinstatement to his old position. He therefore was not asking for new employment and his case falls within the rulings enunciated in Pennwoven and Childs.

In its Supplemental Decision and Order, repeating the language of its original Decision and Order, the Board stated, *inter alia:* "We reject the Respondent's contention that these applications were not for employment, but for 'reinstatement' as this term is technically used by the Board. In so finding we are mindful of the fact that some of the applications were requests for 'our old jobs back', 'reinstatement to our old jobs', or for 'reemployment'. Whatever the language used by the applicants, however, it is clear that in no sense did they expressly or impliedly attach conditions to their requests such as a demand for return to a former position with back pay, seniority, and other rights and privileges which the Board customarily specifies in a remedial order requiring an employer to reinstate employees. We are satisfied that the discriminatees [the applicants], who without exception are industrial factory workers, did not use the terms they employed in the technical sense of labor law experts, but merely expressed themselves in the ordinary manner of former employees seeking jobs from their old employer, and presented themselves as new applicants seeking new employment." We are compelled to disagree with the Board's conclusions as to some of the applicants as set out hereinafter.

We have considered very carefully all of the evidence presented by the record as to whether or not each of the discriminatees, the applicants, covered by the Board's remedial order did apply for new employment. The test, as we envisage it, is not, as Textile seems to insist, that a majority of the applicants asked for reinstatement to their old jobs at one time or another but whether each applicant made it clear that if he or she failed to obtain reinstatement to the old job each was applying for employment is a new employee. On the other hand we cannot accept the test apparently insisted on by the Board and the General Counsel that each discriminatee applied for new employment as a new employee, if he or she failed specifically to insist on rights, such as seniority, inherent in the old position. A few, but only a few, discriminatees did insist on such rights when they asked for reinstatement and such applicants necessarily must be denied relief just as the very few discriminatees who applied for "a job" or "any job" necessarily must be included in the remedial order. Many of the discriminatees asked only for "my job" or "my old job" or for "reinstatement". Conceding that the discriminatees were poorly educated laymen, nonetheless they must be held to the plain meaning of their words. Many of the discriminatees applied in groups and spoke of getting back "our old jobs". Almost all of the discriminatees signed or had their names enrolled in the book maintained by Fleischmann, Textile's employment

manager. The Board lays great emphasis on this fact, concluding that enrollment in the book in and of itself constituted application for employment as distinguished from reinstatement. We cannot accept so broad a view, however. Enrollment in the book was a factor properly to be considered and weighed by the Board along with all other pertinent facts but enrollment itself cannot be deemed to be decisive.

■ We think that the discriminatees included in the Board's remedial order break down into three groups. The first category includes those discriminatees who applied for "a job" or "any job" or for "employment" or used like language under such circumstances as to indicate plainly that each was applying for employment as if he or she sought new employment rather than reinstatement to his or her old job. This group numbers 38 discriminatees. Their names are set out in the margin.[4]

The second group consists of those discriminatees who insisted on rights inherent in their old jobs or who asked for their old jobs back under circumstances indicating that they sought reinstatement to their former positions rather than new employment. These number 23 and their names are set out in the margin.[5] We hold that there is insufficient evidence to support the Board's ruling as to these discriminatees.

The remaining discriminatees included in the Board's remedial order fall into a third category, one peculiarly within the authority of the trier of the fact. Indicative, if not typical, of the evidence of the discriminatees in this group is that of Terefenko who testified that he went to Textile's employment office and said to one of Fleischmann's subordinates: "'I want a job, to see if I can get my job back.'" Terefenko went on to testify: "So I put my name down on the sheet [the enrolling book] and he said he will let me know, he will call me when he needs me." The effect of such testimony and its true intent and meaning can be most adequately ascertained by him who hears the evidence, not by any court or board on a cold record. As with Terefenko so with the remaining discriminatees who comprise the third category. We cannot say that the Board erred in including them in its remedial order.

■ Since the unfair labor practice charged was discriminatory refusal to hire, the General Counsel also had to show that Textile hired others to fill vacant jobs for which the former employees had applied and were qualified. The evidence the General Counsel offered was fairly extensive, for the applicants had many different trades and most of them were qualified in more than one specialty. To show that others were hired for vacancies for which the complaining former employees were qualified, the General Counsel introduced evidence of hirings by Textile in a variety of trades over a period of about two years after the applications for reemployment. The Board summarized the evidence as to each complainant in its opinion. See 96 N.L.R.B. 1333 at 1342 et seq. The Board's conclusion that others had been hired for vacancies the discharged employees might have filled is supported by substan-

4. They are Edinger, Mayer, Race, Warczyglowa, Schweitzer, Swisher, Frees, Quaintance, Kercher, Piotrowski, Joseph Marko, Herzog, Guistwite, Savage, Pike, Koch, Becker, Hartranft, William Miller, Slusser, Matz, Scheipe, O'Connell, Clay, Bauer, DiStasio, Detweiler, Dreher, Robinson, Groff, Norman Miller, Haring, Valerio, Klein, Roth, Walter Davis, Burkhart and Speicher.

5. They are: Cieniewicz, Mengel, Borden, Delcamp, Sheehan, Beck, Majka, Troutman, De Matt, Stoyer, Rupp, Gassert, Smith, Hendricks, Weinrich, Pauline Brubaker Avola, Undheim, Bleiler, Lutz, Ernst, Boyer, Fisher, and John Marko. We include John Marko despite the fact that he was reemployed by "mistake" at his old job, indeed at his old machine. His reemployment lasted about two minutes until Textile became aware that it had reemployed a striker who had caused it some difficulty. The illegality of Textile's action in discharging Marko after reemploying him is all too apparent but he nonetheless falls into the second category.

tial evidence. The only matter which raises any doubt is the long period of time the Board covered in its examination of new hirings. In one case, the Board found that a hiring over seven months after one of the discharged employees had reapplied constituted a discriminatory refusal to hire. This seems a long period of time when the application was intended to fill a vacancy which existed at the time of the application but there is ample evidence in the record that applications entered in Textile's employment register were intended to be continuing ones.[6] Textile's employment manager testified that when he was called upon to fill a vacancy ordinarily he would go to the register to see whether some one who had applied for employment was qualified to fill it.

Finally, Textile has attacked the Board's finding that Textile had refused to hire the former employees because they had been active in a labor organization and in efforts at collective bargaining. Textile insists the discharged employees were not hired simply because there was a company policy never to rehire an employee who had been discharged for any reason, save for lack of work.[7] It is Textile's contention that the existence of this policy alone was sufficient justification for the refusal to take the employees back, even if they did apply for new employment. But Textile's two superintendents stated that the policy forbidding rehiring of discharged employees was not so broad as Textile now defines it and applied only when a former employee had been discharged for "stealing, fighting, refusal to follow orders, and so on." Since no charges of this kind were pending against any of the employees at the time they were discharged the Board properly concluded that refusal to hire was not based on an established policy but on discrimination. That conclusion is supported by substantial evidence.

The Board's petition for enforcement of its order will be granted as indicated in this opinion. An appropriate decree may be submitted.

---

6. The case of Sax v. N. L. R. B., 7 Cir., 1948, 171 F.2d 769, does not support the proposition for which respondent cites it, *viz.*, that a mass application for reinstatement was not a continuing application. The Seventh Circuit expressly recognized that the facts of a particular case might support a finding by the Board that an application for employment was a continuing one. The court stated: "No inference of discrimination can be drawn from the failure to employ the strikers when there was no vacancy at the time they applied. This is conceded. There had to be an application at the time of a vacancy before there could possibly be discrimination. The Board's ruling would dispense with application at the time of a vacancy by the fiction of continuing application. An application when there was no vacancy cannot be used to do duty when a vacancy does occur, in the absence of a clear understanding by the employer that the application was to be considered a continuing one. The record here indicates that the petitioner had no such understanding." See 171 F.2d at page 771.

7. Textile's employment manager testified that this was the policy.