264 F.2d 575
 105 U.S.App.D.C. 102
 LOCAL LODGE NO. 1424, INTERNATIONAL ASSOCIATION OF
MACHINISTS, AFL-CIO; and International Association
of Machinists, AFL-CIO, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BRYAN MANUFACTURING COMPANY, Respondent.
 Nos. 14257, 14324.
 United States Court of Appeals District of Columbia Circuit.
 Argued Oct. 3, 1958.
Decided Feb. 27, 1959.
 
 Mr. Bernard Dunau, Washington, D.C., with whom Mr. Plato E. Papps, Washington, D.C., was on the brief, for petitioners in No. 14257.
 Mr. Frederick U. Reel, Attorney, National Labor Relations Board, with whom Messrs. Jerome D. Fenton, General Counsel, National Labor Relations Board, Thomas J. Dermott, Associate General Counsel, National Labor Relations Board, Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, and William W. Watson, Attorney, National Labor Relations Board, were on the brief, for respondent in No. 14257 and petitioner in No. 14324.
 Mr. Frank L. Gallucci Highland Park, Mich., with whom Mr. Abraham Dobkin was on the brief, for respondent in No. 14324. Mr. Plato E. Papps, Washington, D.C., also entered an appearance for respondent in No. 14324.
 Before PRETTYMAN, Chief Judge, and FAHY and BURGER, Circuit judges.
 BURGER, Circuit Judge.
 
 
 1
 The Bryan Manufacturing Company (respondent in 14324), which then employed about 150 persons in its Reading, Michigan, plant, received a letter in July 1954 from the International Association of Machinists advising that the Machinists represented 'a majority of the 'production and maintenance' employees of your company.' The Machinists sought a collective bargaining agreement.
 
 
 2
 In the proceedings from which this appeal arises it was found by the Trial Examiner and the Labor Board that the Machinists did not in fact represent a majority of the company's employees at that time, and this finding of no majority is not challenged here.[1] At the time the Company received the letter, Local 701, United Auto Workers, was engaged in organizing activities among Bryan employees at the Reading plant, but this was discontinued after the Company signed a collective bargaining agreement with the Machinists.
 
 
 3
 On August 10, 1954, the Company signed a contract with the Machinists without first seeing or seeking any evidence that the Union represented a majority of its employees. No employee authorization cards were shown to management representatives, no election was held, and the Company made no independent inquiry as to the desires of its employees. The August 10, 1954 contract contained a conventional union shop clause and a dues checkoff provision.
 
 
 4
 On June 9, 1955, approximately ten months after the 1954 contract was signed, but two months before it was renewed in a 1955 contract having the same union shop and dues checkoff provisions, one Maryalice Mead[2] filed a charge of unfair labor practices against the Machinists and the Company; on August 5, 1955, she filed supplemental charges.[3] Each charge asserted the frustration of a free choice of the employees in the selection of a bargaining agent. On October 5, 1955, separate complaints were filed against the Union and the Company on the basis of these charges, and the complaints were consolidated for hearing and determination.
 
 
 5
 On August 30, 1955, the Union and the Company signed a new contract which included employees at an additional Bryan plant in a nearby town. Although the new contract had revised seniority provisions, was effective for a different term, and contained several other changes, it had a union shop clause and a dues checkoff provision identical to those in the 1954 contract.
 
 
 6
 Between August 1954 and August 1955 the Company expanded its operation from 150 to 350 employees, and by November 1955 there were 480 persons covered by the contract. Each new employee hired was compelled to join the Machinists union within 45 days of being hired, and each signed an individual dues checkoff authorization. The Union does not challenge the finding that the identical union shop provisions in the 1954 and the 1955 contracts were enforced during the period pertinent here, and that the dues of every employee were checked off under the respective provisions.
 
 
 7
 The Union now seeks review and the Board enforcement of an order and finding that both the Union and the Company violated the Labor Act[4] by maintaining and enforcing the union shop provision[5] and the dues checkoff agreement[6] in the two contracts. The Board held that such enforcement was an unfair labor practice because the basic contract was formally executed at a time when the Union did not represent a majority of the Company's employees. The primary issue presented on appeal is whether the Labor Act's statute of limitations[7] bars the Board from finding that these acts, i.e., the enforcement of the union shop and the monthly checkoff of dues, were unfair labor practices.
 
 
 8
 Our scope of review is limited to determining whether there is substantial evidence in the record as a whole to support the Board's findings of fact, Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, and whether the Board has applied the statute in 'a just and reasoned manner.' Gray v. Powell, 1941, 314 U.S. 402, 411, 62 S.Ct. 326, 332, 86 L.Ed. 301. Having in mind this limited scope of review, we are constrained to uphold the Board's conclusion.
 
 
 9
 If the alleged violation were the mere signing of the original contract in 1954 as distinguished from continuing and repeating its enforcement against employees, the Board's order would be invalid under 10(b). It was rational, however, for the Labor Board to conclude that the violation charged was a continuing one, repeated anew each time the union security clause was enforced or dues checked off. Hence, the statutory period had not expired. N.L.R.B. v. Gaynor News Co., 2 Cir., 1952, 197 F.2d 719, affirmed sub nom. Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B. 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455; Katz v. N.L.R.B., 9 Cir., 1952, 196 F.2d 411. New employees were affected by the contract as they were employed. Each month up to and including the month when the charge was served, dues were deducted from the wages of each employee of the company, including Maryalice Mead, who filed the charge. Thus the contract provisions had a positive impact which was repeated regularly from time to time as to each employee.
 
 
 10
 It is contended that 10(b) prevents the Board from relying on events occurring more than six months prior to service of the charge in order to prove a violation. The union security clause and the dues checkoff provision here involved were proper on their face. Therefore in order to show the illegality of enforcing these agreements, the Board was compelled to look back more than six months in order to show that the Union did not represent a majority of employees when the contract was signed. According to the Union and the Company, the Board may not do this. This issue raises questions on which authority is limited and no cases are precisely or directly in point.
 
 
 11
 In N.L.R.B. v. Gaynor News Co., supra, the Second Circuit upheld a finding that it was a continuing violation for a company to enforce a union shop contract without first obtaining Board certification that a majority of employees had authorized such a contract. Under the then existing law no union shop contract was valid without such a certification.[8] In the case before us the Union and the Company would distinguish the Gaynor News case on the basis that there the absence of the required certificate was observable within the six-month period. There was no need in that case, they point out, to go back beyond the statutory period to demonstrate the illegality of enforcing the union shop clause. Cf. N.L.R.B. v. Carpenters Local, Union No. 1028, A.F.L., 10 Cir., 232 F.2d 454, certiorari denied, 1956, 352 U.S. 839, 77 S.Ct. 60, 1 L.Ed.2d 56. In the instant case no evidence from within the statutory period will serve to show why enforcement is illegal.
 
 
 12
 Section 10(b) is, however, a statute of limitations and not a rule of evidence. N.L.R.B. v. Clausen, 3 Cir., 188 F.2d 439, 443, certiorari denied 1951, 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 653 (dictum). The established rule is that evidence of 'transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny.' F.T.C. v. Cement Institute, 1948, 333 U.S. 683, 705, 68 S.Ct. 793, 805, 92 L.Ed. 1010. This rule is, of course, subject to the important qualification that testimony as to such barred events may be received only as background evidence and may not be given independent significance. See Paramount Cap Mfg. Co. v. N.L.R.B., 8 Cir., 1958, 260 F.2d 109. Put in another way, there must be acts occurring within the six-month period of sufficient status to constitute the violation charged, and evidence of acts outside the period can be received only to illuminate and explain the events within the period.
 
 
 13
 This brings us to the crux of the case: was the fact that the union did not represent a majority of Bryan employees when the contract was signed of such independent significance that its use in evidence is barred by 10(b) or does this fact, in these circumstances merely serve to illuminate and explain the subsequent enforcement of the contract-- an occurrence taking place within the statutory period?
 
 
 14
 The Board did not find here that the formal execution of the 1954 contract with its union security clause and its dues checkoff provision violated the act. It found rather that maintenance and enforcement of the 1954 contract was an unfair labor practice and further that the signing of the 1955 contract also constituted a violation.[9] Since a majority of the Bryan employees were members of the Union by the time the 1955 contract was signed, the illegality of the 1955 contract stems from the illegality of enforcing the 1954 contract for if enforcement of the 1954 contract was an unfair labor practice, the fact that the Union achieved majority status subsequent to its execution and as a direct result thereof does not remove the taint. Changes in status which result from unfair practices have been said by the Supreme Court not to affect the Board's power to restore the status quo ante. Franks Bros. Co. v. N.L.R.B., 1944, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; see Joy Silk Mills, Inc. v. N.L.R.B., 1950, 87 U.S.App.D.C. 360, 372, 185 F.2d 732, 744, certiorari denied 1951, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350.
 
 
 15
 The Board takes the position that evidence of the Union's lack of status when the contract was signed is not in and of itself the basis for its legal conclusions, but is used only to illuminate subsequent events, namely contractually compelled union membership and dues checkoff, these being events which occurred within the six months prior to service of the charges. In this situation, that distinction would seem to have validity because the unfair practices involved are positive acts which are both continuing and repeated. Only where the violations are of this character, i.e., continuing and repeated, however, is it appropriate for the Board to rely on events outside the statutory period to establish a critical element of proof of the offense.
 
 
 16
 It seems to us this distinction is illustrated by N.L.R.B. v. Pennwoven, Inc., 3 Cir., 1952, 194 F.2d 521, and N.L.R.B. v. Childs Co., 2 Cir., 1952, 195 F.2d 617. Those cases hold that a discharge for union activities is not a continuing violation, that the employee's right to reinstatement and back pay is barred after six months from the date of discharge, and that the employer therefore does not commit a new unfair labor practice when he refuses reinstatement and back pay after the six months have run. In those cases there was no affirmative action by the employer in the interim between discharge and demand for reinstatement which could support any concept of continuity.
 
 
 17
 In the instant case, however, the activity which the Board held was an unfair labor practice was the enforcement of the union security clause which was repeated each time a new employee was compelled to join the Union, and the enforcement of the dues checkoff provision which was repeated as to every employee each month. Here the activity charged as being illegal was continuing and repetitive, having a positive impact on the rights of employees every month, if not every day during which the contract was enforced. In such a case it is not unreasonable for the Board, charged with day to day administration of the Labor Act, to say that the facts relating to the genesis of the current illegal activity may be received in evidence even though the statutory period has run with respect to those generative facts. Where there is no continuity (as in Pennwoven and Childs), the original allegedly illegal act must, to have any effect at all, be given significance independent of the subsequent acts and cannot be received. This same distinction was drawn in Katz v. N.L.R.B., supra, 9 Cir., 1952, 196 F.2d 411, 415, note 5a, and in N.L.R.B. v. United Hoisting Co., 3 Cir., 1952, 198 F.2d 465, certiorari denied 1953, 344 U.S. 914, 73 S.Ct. 337, 97 L.Ed. 705; see Superior Engraving Co. v. N.L.R.B., 7 Cir., 1950, 183 F.2d 783, 790, certiorari denied 1951, 340 U.S. 930, 71 S.Ct. 490, 95 L.Ed. 671.
 
 
 18
 Another aspect of the Pennwoven and Childs cases serves to distinguish them from the instant case. In those cases, for the Board to have found an unfair labor practice within the statutory period, it would first have been required to make an express finding that another unfair labor practice had been committed outside the six-month period. The refusal to rehire would only be unlawful if the original firing constituted a violation of the Act or if the refusal were discriminatory. If the employee contends that the current practice, i.e., the refusal to rehire, is discriminatory, then the fact of the original firing may be used as supporting or background evidence. Paramount Cap Mfg. Co. v. N.L.R.B., supra; see N.L.R.B. v. Textile Mach. Works, Inc., 3 Cir., 1954, 214 F.2d 929. The Board is prohibited, however, from making any legal conclusion with regard to events outside the statutory period. American Federation of Grain Millers, A.F. of L. v. N.L.R.B., 5 Cir., 1952, 197 F.2d 451. Although the Board in the instant case must look to the facts surrounding the making of the 1954 contract, its ultimate holding depends on their mere existence rather than on ascribing legal significance to those facts standing alone. In other words it is the enforcing, not the signing, of the contract which is the controlling evidence of the unfair practice.
 
 
 19
 Any other conclusion would permit an employer and a union to enter into what amounts to a collusive contract without consulting the wishes of a single employee, then sit back for six months before enforcing the membership or dues provisions of the contract and rely on 10(b) of the Act to protect them from an unfair practice charge. This would defeat one of the basic purposes of the Act which was to insure that employees could select bargaining agents free from domination or coercion. Few things could be more productive of industrial tyranny than to permit employers and unions thus to dictate selection of bargaining agents without consulting employees. The Board's order is therefore clearly consistent with the spirit of the Labor Act and does not violate the letter of its statute of limitations.
 
 
 20
 There is another factor to be kept in mind in this case: in interpreting, applying and administering a statute of limitations prescribed by Congress in this context, the Board-- and the courts-- are not confronted by precisely the same considerations as apply to statutes of limitations affecting the private rights of two individual litigants. As part of a complex statutory scheme the problem the Board here deals with is far broader than the interests of two private litigants; the rights of an indeterminate number of working men and important rights of the public are also involved, all of this being part of what was thought to be a fairly, if not delicately balanced machinery to preserve collective bargaining equality between employers on the one hand and employees acting through freely and democratically chosen bargaining agents on the other. The Board may have thought that the interests of self determination outweighed otherwise important competing considerations of burying stale disputes. The dispute here involved is not the kind which buries easily but rankles at least once a month in the mind of those offended by being forced, as they see it, to pay tribute to an organization they had no really free choice in joining. We therefore uphold the Board's order under the authority of N.L.R.B. v. Gaynor News Co., supra, 2 Cir., 1952, 197 F.2d 719, affirmed sub nom. Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 and Katz v. N.L.R.B., supra, 9 Cir., 1952, 196 F.2d 411.
 
 
 21
 We turn now to the second phase of the attack made on the Board's order by the Union and the Company. The order requires the Union and the Company, jointly and severally, to reimburse the employees for the initiation fees and dues checked off pursuant to the contract. See note 6 supra. The Company argues, without challenge, that it merely checked off dues pursuant to a written authorization signed by each individual employee. It then passed the dues and the initiation fees to the Union as the contract required. While the Board found that the Company did not dominate the Union, it found that the Company accepted the Union's claim of majority status without ever questioning it and without asking for or seeing any proof to substantiate it. In addition it found that the Union's contractual position had been secured by agreement with the Company without regard to the wishes of the employees.
 
 
 22
 This same problem was recently presented to the Tenth Circuit, and that Court resolved it in accordance with the approach advocated by the Board.[10] The Tenth Circuit held that the Board's order 'should stand unless there is a showing that the order is a patent attempt to achieve ends not designed to fairly effectuate the policies of the Act.'[11] 261 F.2d at page 559. Accordingly the Board's order is affirmed.
 
 
 23
 Petition for review in 14257 dismissed.
 
 
 24
 Petition for enforcement in 14324 granted.
 
 
 25
 FAHY, Circuit Judge, dissenting.
 
 
 26
 The Board decision drew a dissent from Chairman Leedom and Member Murdock. It is set forth in the report of the case at 119 N.L.R.B. (1957) where the problem is analyzed in detail. I agree with the position of the Board dissenters, which may be synopsized in the following language from their opinion:
 
 
 27
 'Although an agreement invalid in its inception may continue to be invalid throughout its life, the fact of its invalidity and the consequent existence of unfair labor practices cannot be established merely by proof that the agreement was being maintained at some point in time subsequent to its execution, but can only be established by proof of the facts, surrounding its execution in the past, which created the initial invalidity. When as here, therefore, the charges are filed more than 6 months after the execution of the agreement, proof of its invalidity and the consequent unfair labor practices can only be established by reliance on evidence of events which occurred more than 6 months before the filing of the charge. This Congress expressly precluded by Section 10(b).
 
 
 28
 'It is well established that in making unfair labor practice findings the Board cannot rely solely on events which occurred more than 6 months before the filing of the charges, even though evidence as to such events is admissible for background purposes; and this is so even though the effect of such events continues to be felt within the 6-month period.'
 
 
 29
 One of the principal purposes of a statute of limitations is to bring repose. As stated in N.L.R.B. v. Pennwoven, Inc., 3 Cir., 1952, 194 F.2d 521, 524, the rationale underlying such a statute is to prevent 'people * * * being brought to book upon stale charges.' Consistently with this, the period of limitations in the Taft-Hartley Act must have been deliberately adopted by Congress to aid in stabilizing labor relations by precluding adversary proceedings based on events which had laid dormant for six months. Under the decision of the court, however, there is no limit whatsoever to the time that might pass, with countless changes in the details of relations and obligations, without a complaint being barred, although proof of the true basis of illegality of the conduct complained of lies in the years that are gone. This seems to me inconsistent with the Congressional policy expressed in 10(b).
 
 
 30
 We are not concerned now with the hypothetical case postulated by the court in which a collusive contract is not enforced for six months after its execution so as to evade the statute of limitations. I think that would present a different legal problem.
 
 
 
 [1]
 At the hearing on the complaint before the Trial Examiner thirteen persons employed at Reading when the contract was signed testified that they did not know or hear that the Machinists had interested themselves in organizing the plant until about a week after the contract was signed. It was stipulated that an additional thirteen employees would give similar testimony
 
 
 [2]
 She was employed by Bryan at the Reading plant from November 1953 until October 1955
 
 
 [3]
 The Board adopted the Trial Examiner's finding inter alia that, in the spring of 1955 'discontent at the Reading plant developed among employees who resented the way in which their right to selfdetermination had been thwarted when the IAM's (Machinists') contract had literally been thrust upon them * * *.'
 
 
 [4]
 National Labor Relations Act, 8(a)(1-3), (b)(1, 2), 61 Stat. 140 (1947), 29 U.S.C.A. 158(a)(1-3), (b)(1, 2)
 
 
 [5]
 'As a condition of employment, all employees covered by this agreement shall, forty-five (45) days after the date of execution of this agreement, or in the case of new employees forty-five (45) days after the date of hiring, become members of the Union, and remain members in good standing in the Union during the term of this agreement.'
 
 
 [6]
 'Upon receipt of a signed authorization of the employee involved, the Company shall deduct from the employee's pay check the initiation fee and dues payable by him to the Union during the period provided for in said authorization
 'Deductions provided for above shall be remitted to the financial secretary of the Union no later than the tenth day of the month following the deduction. The Company shall furnish the financial secretary of the Union monthly pay record of those for whom deductions have been made. * * *'
 
 
 [7]
 National Labor Relations Act 10(b), 61 Stat. 146 (1947), 29 U.S.C.A. 160(b): 'Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *.'
 
 
 [8]
 National Labor Relations Act, 8(a)(3), Provided (ii), 61 Stat. 140 (1947), subsequently amended by 65 Stat. 601 (1951), 29 U.S.C.A. 158(a)(3), Provided (ii)
 
 
 [9]
 The Board adopted the Trial Examiner's finding 'that the 1955 agreement is a modification and extension of the 1954 agreement.' The Examiner reasoned in the alternative, however, that 'even if the 1955 agreement were to be considered a new agreement between different parties, the fact remains that any majority claimed by the Local Lodge at the time the 1955 agreement was entered into, which rests on the checkoff authorizations then in effect and secured pursuant to the 1954 agreement, clearly would have no validity in establishing an unassisted majority, under the holding of the Board' in Oliver Mach. Corp., 102 N.L.R.B. 822 (1953), enforced 6 Cir., 1954, 210 F.2d 946. It is unnecessary for us to pass on the validity of the finding that the 1955 agreement was only an extension of the 1954 contract; we accept the Trial Examiner's reasoning that, whether it was an extension of the 1954 contract, or whether it was a new and independent contract, its validity depends on conditions which prevailed on August 10, 1954
 
 
 [10]
 N.L.R.B. v. Broderick Wood Products Co., 10 Cir., 1958, 261 F.2d 548
 
 
 [11]
 261 F.2d at page 559 quoting Virginia Electric & Power Co. v. N.L.R.B., 1943, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568