## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## LOW KIT MINING COMPANY, A successor to Spangler Coal Company, Incorporated, Respondent.

### No. 93–1060.

United States Court of Appeals, Fourth Circuit.

Argued June 10, 1993.

Decided Aug. 25, 1993.

Margaret Ellen Luke, N.L.R.B., Washington, DC, argued (Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karations Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Peter Winkler, Supervisory Atty., N.L.R.B., on brief), for petitioner.

Mark Anthony Carter, argued (Forrest H. Roles, on brief), Smith, Heenan & Althen, Charleston, WV, for respondent.

Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and HAMILTON and WILLIAMS, Circuit Judges.

## OPINION

HAMILTON, Circuit Judge:

The National Labor Relations Board (NLRB) seeks enforcement of its order, 309 N.L.R.B. No. 76, adopting the recommended factual findings, conclusions of law and remedies of the Administrative Law Judge (ALJ). The ALJ recommended setting aside a prior settlement agreement between the United Mine Worker's Association (the Union) and Low Kit Mining Company (Low Kit) for two alternative reasons. First, the ALJ found that Low Kit committed an unfair labor practice in violation of § 8(a)(1) and (3) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1) and (3), after executing the settlement agreement. Second, the ALJ found that Low Kit failed to comply with the express terms of the settlement agreement. The ALJ then recommended requiring Low Kit to undertake several remedial actions. Finding no error, we grant the NLRB's application for enforcement.

### I

The events in this case arise from the mining of bituminous coal on Spangler Mountain, a mine site opened in December 1990, near Pond Gap in the Kelley's Creek area in Kanawha County, West Virginia. The mineral rights to the coal were owned by three entities who leased them to Logan Coal and Export Corporation (Logan), a company owned by David L. Swango. Swango was also Logan's president and sole director. Logan contracted with J.G. Leasing to perform the actual mining. With Logan's permission, J.G. Leasing subcontracted the labor portion of the mining to Spangler Coal Company, Inc. (Spangler). Spangler was nominally owned by Dwayne Atkins, who also served as its mine superintendent.

In December 1990, Atkins began to recruit employees for the various classifications involved in a mining operation.[1] During these interviews, Atkins made several statements indicating that he wanted to operate the Spangler Mine on a non-union basis. Specifically, Atkins stated "this is a non-union operation and it will run non-union," and indicated that the lessors of the mineral rights would "pull the contract" if the mine became unionized. (Joint Appendix (J.A.) 599). Atkins hired about twenty to twenty-five men who worked initially on two shifts for ten hours each and also on a so-called maintenance shift.

During the first months of Spangler's operations, Spangler failed to withhold taxes or social security from its employees' paychecks. Atkins informed the employees that Spangler could not afford to pay such taxes. Because the employees were concerned about the failure to withhold such taxes, several employees contacted an organizer for the Union to inform him that the employees at Spangler desired Union membership. Alan Nichols, an employee of Spangler, then obtained Union designation cards and began soliciting memberships, both on and off Spangler's premises. Between February and March 1991, some fifteen out of the approximately twenty to twenty-five employees signed these cards.

At the outset of the Union drive, the Union sent a letter to Spangler officials informing them that the Union was in the process of organizing their employees. On February 16, in response to this letter, Spangler held a meeting with its employees at the end of the evening shift. During this meeting, Atkins told the employees that they would have no say in the mine's operation if the Union won the right to represent them and Spangler would "pull the plug on the mine" if it went union. (J.A. 600).

On February 21, 1991, Spangler again held a meeting with eight employees on the evening shift. The mine's foreman, Danny

---

1. These classifications included foreman, roof bolters, fire bosses, beltmen, electricians, shuttle car operators, loader operators, cutters, drillers and ordinary laborers.

Beasley, also attended. During this meeting, Atkins told the employees that he knew someone was trying to organize the mine, he knew the identity of that person, and the effort would cause men to lose their jobs. Atkins added that he knew there was a planned Union meeting the next weekend in a nearby city, and he would know who attended the meeting. Atkins again emphasized that Spangler was a non-union mine and should remain so.

Shortly after this meeting, Nichols, who had attended the prior meeting, returned to the office and told Atkins that he was the one soliciting the Union cards. He added that he would not turn them over to the Union because he needed to keep his job. In response, Atkins took out Spangler's financial records in an effort to prove to Nichols that Spangler could not afford the Union's wages. Atkins added that the mine was a small operation, but might be able to afford those wages next year.

On March 15, 1991, Spangler terminated seven employees on the night shift including: Alan Nichols, Paul D. Bartley, Steve A. Browning, Mickey Hager, Leroy Halstead, Lester M. Lanham and Rodney D. Lanham. Each employee was given the same letter in his pay envelope, stating "you are terminated for lack of work this date." (J.A. 602). Each of these employees had recently signed a Union authorization card, had a good work record, lengthy mining experience and was qualified to perform several different mining functions. Upon receiving his notice of discharge, Nichols inquired why others with less seniority had not been discharged. Atkins responded that seniority did not mean anything at Spangler.[2]

On the following Monday, the discharged employees set up a picket line approximately one-quarter of a mile from the mine entrance to protest their discharges. Most of the other employees observed the picket line, thereby causing an interruption in Spangler's operations. After the employees had picketed for a week, Atkins held a meeting on Saturday and announced that all of the employees could go back to work beginning the next day, Sunday, March 24. Thus, Spangler rehired the entire night shift, including those employees who had been laid off.

On Monday, March 25, as a result of the March 15 discharges, the Union filed an unfair labor practice charge against Spangler with the NLRB. On April 22, the Union amended its unfair labor practice charge against Spangler to include allegations that Spangler had engaged in coercive conduct, including interrogating job applicants, threatening to discharge employees and to close the mine, and creating the impression of surveillance. On May 7, the NLRB issued a complaint on the Union's unfair labor practice allegations.

Meanwhile, the Union's process of organizing Spangler's employees continued. On April 12, 1991, the Union formally filed a petition with the NLRB seeking to represent Spangler's production and maintenance employees in collective bargaining negotiations with Spangler's management. By letter dated April 29, 1991, Atkins sent a letter to Spangler's employees, confirming an earlier oral promise that Spangler would give them a $2.50 per hour raise and insurance benefits. Spangler and the Union dispute whether the prior oral promise occurred before the Union filed its representation petition on April 12, 1991.

On May 17, 1991, the NLRB conducted a representation election at Spangler to determine whether the Union would have the right to represent Spangler's employees in collective bargaining negotiations. The Union lost by a vote of twelve to nine. The day after the election, Atkins called Nichols into his office and informed him: "The election is over now, and I can say what I want to say.... If that union had went in here, I would have pulled the plug on this mine." (J.A. 603). On May 22, the Union filed objections to the election, contending that Spangler had interfered with the representation election by promising a raise and insur-

2. On March 11, 1991, Spangler also discharged Louis Fauber, whom Atkins knew to be a former president of a union local at a prior employer. Fauber had requested time off from work to tend to his truck after it caught fire on the way to work that day. After Atkins refused the request and Fauber left nonetheless, Atkins discharged Fauber.

ance benefits if the employees would vote against the Union at the election. In June, the NLRB scheduled a consolidated hearing for September 3, 1991 on the unfair labor practice complaint and the election objections.

On July 8, 1991, a Spangler employee notified Nichols, Kenneth Derrick, R. Lanham and Thomas Osborne by telephone that they were being laid off until further notice because of poor coal sales.[3] Neither the Union nor the NLRB challenged these layoffs as improper. Two weeks after the layoffs, Spangler recalled Osborne and he returned to work as a beltman.

Late in July, Atkins left Spangler and was replaced by Spangler's foreman, Beasley. On August 11, Osborne asked Beasley for permission to leave work to meet with an NLRB agent who was investigating the pending unfair labor practice complaint. Beasley granted the leave. On August 12, Osborne was injured on the job, and telephoned J.G. Leasing's owner to report the injury. During this conversation, the owner informed Osborne that he was being laid off. Neither the Union nor the NLRB claimed this discharge was improper.

On August 17, 1991, Spangler ceased operations at the mine site because of slow sales. David Swango then established Low Kit. Swango assumed the position of Low Kit's secretary and member of the board of directors and named Beasley, Spangler's mine foreman, as Low Kit's president and mine superintendent. On August 19, 1991, Low Kit assumed control of the mining operations and continued to operate the mine under the Logan mining permit.

On August 19, Swango called Spangler's employees together, informed them of the changeover and told them that they could continue working under the same terms and conditions of employment. Low Kit retained all of those employees who appeared for work that day and who were covered by Spangler's final payroll. Low Kit did not ask these employees to complete new job applica-

tions, but did ask them to complete new W–4 forms.

After Low Kit assumed the mining operations, the Union and Low Kit began negotiating a possible settlement for the pending unfair labor practice complaint arising from Spangler's prior acts. Both parties desired to settle their dispute before the scheduled NLRB hearing on September 3, 1991. Low Kit subsequently entered into a settlement agreement with the Union which required Low Kit, as Spangler's successor, to: cease and desist from engaging in coercive conduct; pay back wages to the eight employees discharged in March; provide substantially equivalent employment to one of the eight employees discharged in March; send letters to those employees notifying them that their discharges would not be used as a basis for future personnel actions; and, post a notice informing all employees that Low Kit would take the steps noted. However, the settlement agreement did not require Low Kit to recall any of the Discriminatees discharged in July and August or pay them any back wages from the date of their discharge.

The NLRB's acting regional director approved the written, signed settlement agreement around September 25, 1991. Thereafter, Low Kit complied with the back pay provision of the settlement agreement, but failed to send any of the employees the requisite notices that their discharge would not be used as the basis for future adverse action against them.[4]

In late summer and early fall 1991, the Discriminatees made several attempts to return to work for Low Kit. For example, during August and September, Osborne twice asked to be recalled. Specifically, in August, Osborne told Swango that he wished to return to work, and Swango replied that when Osborne received a medical release, Swango would put him back to work. On September 9, after obtaining his doctor's release, Osborne telephoned Low Kit to give notice that he was ready to work. After an employee at Low Kit told him to call Beasley,

---

3.  For reasons that will become apparent, these employees are collectively referred to as the "Discriminatees."

4.  These letters are referred to as "Expungement Letters."

and Osborne did so, Beasley responded "OK." However, Low Kit never recalled Osborne.

In September, Derrick also made several efforts to be recalled. Upon Derrick's first visit to the mine, he asked when he and the others could return to work, to which Beasley answered that Low Kit would not hire "right now." During Derrick's second visit to request work, Beasley told him that Low Kit could not hire anyone until it switched from battery-powered electrical power to public power. Beasley never notified Derrick of any openings and Derrick was never recalled.

During the week of October 18, R. Lanham also asked Beasley for work. Beasley gave Lanham the same excuse, Low Kit would make no hiring decisions until it switched to a public power supply. Both Lanham and Osborne went to the mine again on October 21 and asked for work, and Beasley again offered the power supply as the reason for not hiring them. Beasley then announced for the first time that the employees would have to complete new applications because Low Kit was a new employer. Although Lanham completed a job application and returned it to Beasley, Lanham was never recalled.

During this same time frame, Low Kit hired new employees from a nearby county. Low Kit did not advertise for applications when filling its vacancies, but rather "put out the word" among a few of its current employees, some of whom had crossed the picket line in March. During October, Low Kit filled the following positions: on October 2, Low Kit hired Michael Laws as a laborer; on October 7, it hired Ronnie Johnson as a roof bolter; on October 17, it hired Earnest Graley as a shuttle car operator; on October 25, it hired Roger Laws as an electrician; and on October 28, it hired Jerry Holstein as a beltman.[5]

The four Discriminatees were equally qualified to fill most of these positions, i.e., laborers, shuttle car operators, beltmen and, with the exception of Osborne, roof bolters. How-

ever, Low Kit never informed them of the vacancies for these positions. At the end of October, after the Discriminatees learned of the new hirings, they picketed the mine in protest of Low Kit's failure to recall them. Beasley then told them that they must complete job applications because Low Kit was a new employer.

On November 22, 1991, the Union filed its second unfair labor practice charge against Low Kit, alleging primarily that Low Kit engaged in a pattern of harassment and discrimination against Union sympathizers. On January 10, 1992, the regional director for the NLRB vacated the settlement agreement and issued a new consolidated complaint. In this complaint, the regional director alleged that Low Kit:

> refused to reinstate its employees Kenneth Derrick, Rodney D. Lanham, ... Alan H. Nichols ..., [and] Thomas Osborne.... By the conduct described [above, Low Kit] has been discriminating in regard to the hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization in violation of § 8(a)(1) and (3) of the Act.

(J.A. 585–86).

On April 29, 1992, an ALJ heard the NLRB's complaint. After reviewing all the evidence, the ALJ found that Low Kit violated § 8(a)(1) and (3) of the Act (29 U.S.C. § 158(a)(1) and (3)) by discriminating in regard to hiring with respect to the four Discriminatees. Specifically, the ALJ found that Low Kit refused to recall the Discriminatees because of their prounion sympathies. The ALJ further found that Low Kit violated the terms of the settlement agreement by failing to send the required Expungement Letters. Because of the unlawful failure to recall the four Discriminatees and the violations of the settlement agreement, the ALJ recommended setting aside the settlement agreement between the Union and Low Kit.

Since the ALJ recommended setting aside the settlement agreement, the ALJ also

---

5. Low Kit also hired Holstein as a "fire boss" because he had the special certification for this position. However, because the duties of fire boss consumed only forty-five minutes to an hour per day, Holstein's primary role was a beltman.

found that Low Kit should be responsible for any unfair labor practices committed by Spangler prior to the settlement agreement because Low Kit was Spangler's successor in interest and knew of the pending allegations of unfair labor practices when it took over Spangler's operations. The ALJ then examined Spangler's conduct prior to the settlement agreement and found several additional unfair labor practices for which Low Kit was responsible. Specifically, the ALJ found that Spangler violated § 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)) by: coercively interrogating employees about their and other employees' union activities; threatening to close the mine if the employees selected the Union; creating the impression of surveillance and actually engaging in surveillance of employees' union activities; threatening to place employees' union activities under surveillance; and improperly discharging the eight night shift employees in March 1991. Finally, the ALJ found that, by promising both wage increases and insurance benefits just before the Union's representation election, Spangler committed a "classic unfair labor practice[ ]." (J.A. 613).

As a remedy for the unfair labor practices committed before the settlement agreement, the ALJ recommended requiring Low Kit to cease and desist from the unlawful conduct found, and from interfering in any way with its employees' statutory rights to engage in union activities. The ALJ also recommended setting aside the representation election held May 17, 1991. To remedy the unfair labor practices committed after the settlement agreement, the ALJ's order recommended requiring Low Kit to: offer reinstatement with back pay to the four Discriminatees unlawfully denied recall; expunge from Low Kit's files any references to the unlawful refusal to recall; notify the affected employees in writing that this had been done; and post a remedial notice. With minor modifications, the NLRB adopted the ALJ's recommended factual findings, conclusions of law and remedies.

■ The NLRB now petitions this court for enforcement of its order.[6]

## II

In opposing the NLRB's application for enforcement, Low Kit first claims the ALJ erred in finding that Low Kit committed an unfair labor practice by refusing to recall the four Discriminatees. Low Kit presents two theories to support this argument. We believe neither theory has merit and discuss our reasons with respect to each argument separately.

## A

■ Low Kit first argues that the ALJ erred as a matter of law in finding that Low Kit violated § 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1) and (3), when it failed to recall the four Discriminatees.[7] Low Kit reasons that a duty to recall only arises when the employer improperly discharged the employees in the first place. Because the NLRB does not dispute that Spangler legitimately discharged these employees, Low Kit concludes that the NLRB could not, as a matter of law, establish that Low Kit violated the Act when it refused to recall these employees. We disagree.

■ Generally, the failure to reinstate a former employee does not amount to an unfair labor practice unless the original dis-

---

6. Low Kit has subsequently ceased operations and, therefore, only challenges that part of the order requiring it to pay back wages to the four Discriminatees unlawfully denied recall. Low Kit apparently limits its challenge to the back wages issue because that is the only financial obligation imposed by the NLRB's order. However, if properly issued, the NLRB would be entitled to enforce its entire order against any successor to Low Kit established by David Swango. *NLRB v. St. Mary's Foundry Co.,* 860 F.2d 679, 682 (6th Cir.1988). Thus, we shall review the merits of the entire NLRB order.

7. Section 8(a)(1) and (3) of the Act provide, in relevant part:

It shall be an unfair labor practice for an employer
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this chapter [the right to form, join, or assist labor organizations] ...;
[or] (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

charge was improper. *NLRB v. Textile Machine Works*, 214 F.2d 929, 932 (3d Cir.1954). However, regardless of the reasons for the original discharge, when an employer fails to rehire a former employee on account of that employee's prior union activities, "the employer has committed a separate and distinct unfair labor practice." *Id.* (citing *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941)). Thus, this court recognizes that even when an employee's original discharge is legitimate, the employer nonetheless commits an unfair labor practice when it refuses to rehire that employee because of his or her union sympathies. *Halstead Metal Products v. NLRB*, 940 F.2d 66, 69 (4th Cir.1991). As we have observed:

> A successor employer is free either to hire or refuse to hire a former employee of its predecessor, except that if the successor refuses to hire such an employee because of his prounion activities or sentiments, and is thus motivated in refusing to do so by anti-union animus, then the successor has "discriminated in regard to hire" in respect to that employee and has thereby committed an unfair labor practice in violation of section 8(a)(3) of the Act.

*NLRB v. General Wood Preserving Co.*, 905 F.2d 803, 818 (4th Cir.1990) (citations omitted).

In the present case, we believe the unfair labor practice alleged by the NLRB involved the latter type of activity, *i.e.*, discrimination in regard to hire because of anti-union animus. In other words, the NLRB claimed that Low Kit failed to recall the four Discriminatees *because of Low Kit's impermissible discrimination against the prounion sentiments of the Discriminatees.*[8] Such an allegation, if proven, unquestionably amounts to an unfair labor practice. *Halstead Metal*

*Products*, 940 F.2d at 69. Moreover, because a failure to recall due to an anti-union animus is a "separate and distinct unfair labor practice," we think the legitimacy of the Discriminatees' original discharges is wholly irrelevant. *Textile Machine Works*, 214 F.2d at 932.

■ In reaching this conclusion, we also reject Low Kit's contention that the NLRB's complaint did not adequately apprise Low Kit of the specific labor practice which the NLRB challenged as unfair. At oral argument, Low Kit asserted that the NLRB's complaint led it to believe the particular labor practice which the NLRB claimed to be unfair was the mere failure to reinstate the four Discriminatees rather than its discrimination against these people in regard to hire, *i.e.*, refusing to recall them because of their pro-union sentiments.

We reject this argument because we believe the NLRB's complaint adequately apprised Low Kit of the specific labor practice which the NLRB claimed to be unfair. As mentioned, the complaint specifically alleged "[b]y the conduct described in paragraph 6 [*i.e.*, refusing to reinstate the Discriminatees], Respondent [Low Kit] has been discriminating in regard to the *hire* ... of its employees in violation of Section 8(a)(1) and (3) of the Act." (J.A. 586) (emphasis added). Moreover, the ALJ clearly recognized the crux of the NLRB's complaint when it opined: "[Low Kit] may not have had a legal duty to ... reinstate laid-off Spangler employees but it had a legal duty to avoid discrimination on the basis of union sympathies and affiliations in ... making hiring determinations." (J.A. 610–11). Clearly, the NLRB's allegation apprised Low Kit of the

---

8. The NLRB's complaint clearly illustrates this point. Specifically, the NLRB's complaint averred that Low Kit "refused to reinstate" the four Discriminatees and added "[b]y [that] conduct [Low Kit] ... has been discriminating in regard to the hir[ing] ... of its employees in violation of Section 8(a)(1) and (3) of the Act." (J.A. 586). The ALJ also recognized the NLRB's essential allegation when it opined: "[Low Kit] may not have had a legal duty to ... reinstate laid-off Spangler employees but it had a legal duty to avoid discrimination on the basis of union sympathies and affiliations in ... making

hiring determinations." (J.A. 610–11). Moreover, the mere fact that the NLRB alleged a violation of § 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) clearly indicates that the purported unfair labor practice was Low Kit's discrimination against the four Discriminatees in regard to hiring because of their union sympathies. That statute specifically states: "it shall be an unfair labor practice for an employer ... by discrimination in regard to *hire* ... to ... discourage membership in any labor organization." (emphasis added).

specific labor practice which the NLRB claimed to be unfair, *i.e.*, Low Kit's discriminatory refusal to recall because of its anti-union animus.[9]

**B**

Low Kit next challenges the ALJ's factual finding that it discriminated in regard to hire against the four Discriminatees in question. Specifically, Low Kit argues that its decision to hire people other than the Discriminatees did not amount to discrimination because: (a) none of the Discriminatees filled out an application form for a new job and (b) the new hires were more qualified. Because it is undisputed that Spangler lawfully discharged these employees, Low Kit concludes that it cannot be charged with discrimination since none of the Discriminatees formally applied for employment and the new hires were more qualified.[10] We disagree.

■ In 1983, the Supreme Court fashioned a two-step process for courts to apply in determining whether an employer's motivation in a refusal to rehire is improper under the Act. *NLRB v. Transport Management Corp.*, 462 U.S. 393, 401–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983). First, the NLRB must establish that the employer's decision not to rehire a union sympathizer was "motivated by anti-union considerations." *General Wood Preserving Co.*, 905 F.2d at 818. This is a factual question, supportable by either direct or circumstantial evidence. *American Thread Co. v. NLRB*, 631 F.2d 316, 321 (4th Cir.1980). In addition, a reviewing court must accept the NLRB's finding of improper motive if supported by substantial evidence. *NLRB v. Nueva Engineering*, 761 F.2d 961, 967 (4th Cir.1985).

■ Second, if the NLRB finds the requisite anti-union motivation, the employer must offer persuasive evidence that the hir-

ing decision would have occurred regardless of these motives. *General Wood Preserving Co.*, 905 F.2d at 818. However, the NLRB may reject the proffered explanation as "pretextual." *Nueva Engineering*, 761 F.2d at 968. Such a finding must withstand scrutiny if supported by substantial evidence. *Id.*

■ In the present case, we believe substantial evidence supports the NLRB's conclusion that Low Kit refused to rehire the four Discriminatees because of their pro-union sympathies. Specifically, the record clearly indicates that Low Kit knew of the Discriminatees' pro-union activities, *e.g.*, signing the Union authorization cards and either participating in or observing the March 1991 picket line. During August, September and October 1991, Osborne, Derrick and R. Lanham made several inquiries about job openings with Low Kit. Low Kit told these employees that no hiring would occur until after the mine changed its power supply. In actuality, however, Low Kit had already begun hiring new employees. For example, during the week of October 18, 1991, R. Lanham asked Beasley (at Low Kit) for a job. Although Beasley told him that he would not hire until the mine changed its power source, Low Kit had already hired three new employees to perform jobs for which Lanham was qualified (*e.g.*, laborer, roof bolter and shuttle car operator). Moreover, Low Kit hired Holstein as a beltman (a position for which Lanham was also qualified) after Lanham applied. Finally, Low Kit hired most of the new employees through referrals from employees who had demonstrated opposition to the Union by crossing the picket line in March 1991.

Because the NLRB established that Low Kit's hiring practices stemmed from "anti-union considerations," Low Kit must offer persuasive evidence that its hiring decisions would have occurred regardless of the anti-union animus. As mentioned, Low Kit at-

---

**9.** Naturally, because Low Kit's unfair labor practice involved its discrimination in regard to hiring, rather than a mere failure to reinstate, the back wages for which it is liable should begin to accrue with the date of its discrimination, rather than the date of the original discharge of the four Discriminatees.

**10.** *See, e.g., Maphis Chapman Corporation*, 151 NLRB 73, 84 (1965) ("the employer is 'under no obligation to seek out and offer [former employees] future employment.'"); *Fruehauf Trailer*, 162 NLRB 195, 214 (1966) (employee is required to have applied for jobs before § 8(a)(3) violation for failure to reinstate can be articulated.).

tempts to satisfy this requirement by arguing that: (a) none of the four Discriminatees applied for a job at a time when Low Kit was hiring and (b) the new hires were more qualified. However, substantial evidence supports the NLRB's conclusion that both of these excuses were pretextual. For example, the record indicates that Low Kit did not require any of Spangler's other employees to complete an application before Low Kit offered them employment. In addition, R. Lanham did complete an application, but Low Kit subsequently hired Holstein to fill a position for which Lanham was qualified. Finally, with respect to the qualifications of the Discriminatees, the record reveals that they were as qualified as the new hires to fill four of the five positions which the new hires filled (*e.g.*, laborer, shuttle car operator, roof bolter and beltman).[11]

In light of these facts, we believe substantial evidence supports the NLRB's conclusion that Low Kit's purported reason for not hiring the four Discriminatees was pretextual. Thus, we also think the NLRB adequately established that Low Kit refused to recall the Discriminatees because of their pro-union sympathies. Finally, because this discrimination amounts to an unfair labor practice occurring after Low Kit entered into a settlement agreement with the Union, which settlement agreement may be "set aside . . . if post-settlement unfair labor practices are committed," we think the ALJ justifiably vacated the settlement agreement between Low Kit and the Union. *YMCA of the Pikes Peak Region, Inc. v. NLRB*, 914 F.2d 1442, 1449 (10th Cir.1990) (quotation omitted).[12]

## III

Low Kit next argues that the ALJ erred in recommending to vacate the results of the employees' vote on the Union's petition for representation. The ALJ made this recommendation because it found that Spangler violated the Act by promising pay raises and health insurance benefits on April 29, 1991, soon after the Union filed its petition for representation on April 12, 1991. Because Low Kit claims it originally made this promise orally on April 1, 1991—eleven days before the Union filed its petition for representation—Low Kit contends that Spangler's April 29 letter to its employees merely confirmed the prior oral promise made before the Union filed its petition. Thus, Low Kit concludes that this letter did not amount to "a classic unfair labor practice." (J.A. 613).

Although this argument might have merit, we believe this issue is not ripe for adjudication by this court. In the NLRB's order adopting the recommended factual findings, conclusions of law and remedies of the ALJ, the NLRB severed the claims relating to the employees' vote on the Union's petition for representation from the other claims relating to the unfair labor practices, and remanded the election issue to the regional director for the direction of a second election. (J.A. 552). Such an order is not final under the Act and is, therefore, not ripe for judicial review. *See, e.g., Boire v. Greyhound Corp.*, 376 U.S. 473, 479, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964) ("The purpose of § 9(d) [of the Act is] to provide for review in the courts only after the election has been held and the Board has ordered the employer to do something predicated upon the results of the election.") (quoting 79 Cong.Rec. 7658 (1935) (statement of Sen. Walsh)). *See also, Raley's, Inc. v. NLRB*, 725 F.2d 1204, 1206 (9th Cir.1984) (*en banc*) ("The Supreme Court in *Boire* clearly held that an election order is not a final order subject to direct appellate review."). Accordingly, this court

---

**11.** Additional evidence for rejecting Low Kit's excuses as pretextual comes from the fact that Low Kit has abandoned the change in power supply excuse for not recalling the four Discriminatees. *NLRB v. Georgia Rug Mill*, 308 F.2d 89, 91 (5th Cir.1962) ("when an employer shifts positions several times in explaining why an employee [was not recalled], his own case is weakened and the Board's conclusion that the true reason was for union activity is correspondingly strengthened.").

**12.** Because this unfair labor practice justified the ALJ's decision to set aside the settlement agreement, we need not address whether Low Kit's failure to mail the Expungement Letters amounted to a breach of the settlement agreement. Such a failure would only provide an alternative basis for setting aside the settlement agreement. *YMCA of the Pikes Peak Region*, 914 F.2d at 1449.

cannot address the NLRB's order requiring Low Kit to conduct a second election until after the NLRB requires Low Kit to comply with the results of the second election.

## IV

For the reasons stated herein, we grant the NLRB's application for enforcement of its order.

***ENFORCEMENT GRANTED.***