WILKINSON, Circuit Judge,
concurring:
I concur fully in Chief Judge Traxler’s fíne opinion. I agree with him that substantial evidence did support the Board’s interrogation and confiscation findings, but that the part of the Board’s order concluding that Intertape engaged in unlawful surveillance of union activity improperly compromised Intertape’.s right to 'tell employees its side of the story.
Left to my own devices, I would hold that, even if the unfair labor practices alleged by the General Counsel had occurred, the Board would have exceeded its remedial discretion by ordering a new election. This is all the more so where the Board’s most critical finding supporting its direction of a new election has been overturned. Whatever remedial measures may be warranted, a new election is not among them. Intertape’s, margins in the first election were huge, and its infractions were comparatively minor. The Board’s decision to order a new election in these circumstances failed to respect the choice Intertape’s employees made.
I acknowledge, however, that circuit precedent does not leave me to my own devices. See, e.g., NLRB v. Low Kit Min. Co., 3 F.3d 720, 729-30 (4th Cir.1993); Daniel Const. Co. v. NLRB, 341 F.2d 805, 809-10 (4th Cir.1965). As a result, I join the court’s opinion, including the terms of the remand order, which provides simply that the Board will “find it necessary to reconsider its decision to direct a second election.” Maj. Op. at 241. I suggest, however, that the authority of circuit courts to review a Board’s do-over election order at this stage of the proceedings warrants additional reflection and Reexamination, bearing foremost in mind the need to restore a sense of balance between agencies and courts.
I.
Agencies do many good and necessary things. Through their efforts, our envi *242 ronment is cleaner, our food safer, our economy steadier, and our labor-management relations smoother. Behind these blessings, however, is a growing bureaucracy, a “vast power [that] touches almost every aspect of daily life.” City of Arlington, Tex. v. FCC, — U.S.-, 133 S.Ct. 1863, 1878, — L.Ed.2d -(2013) (Roberts, C.J., dissenting). This power draws its strength from its frequent combination of the legislative, executive, and judicial functions — a combination that “heighten[s] the potential for abuses that the traditional system was designed to check.” Cass R. Sunstein, Constitutionalism After the New Deal, 101 Harv. L.Rev. 421, 447 (1987); see also The Federalist No. 47 (James Madison) (“The accumulation of all powers ... in the same hands ... may justly be pronounced the very definition of tyranny.”).
Unfortunately, this potential for abuse meets little resistance from ordinary democratic processes. The difficulty of passing a bill in both houses and surviving a potential presidential veto “limits [ ] Congress’s ability to impose” its will on the administrative state. Elena Kagan, Presidential Administration, 114 Harv. L.Rev. 2245, 2259 (2001). Presidential control offers no sure hope either, because “no President (or his executive office staff) could ... supervise so broad a swath of regulatory activity.” Id. at 2250; cf. City of Arlington, Tex., 133 S.Ct. at 1878 (Roberts, C.J., dissenting) (“President Truman colorfully described his power over ■ the administrative state by complaining, ‘I thought I was the President, but when it comes to these bureaucrats, I can’t do a damn thing.’ ”). Even if the President could fully supervise the executive branch, he would face little pressure from voters to do so, for “the general public is often unaware of political decisions being made at the agency level.” Donald S. Dobkin, The Rise of the Administrative State: A Prescription for Lawlessness, 17 Kan. J.L. & Pub. Pol’y 362, 367 (2008).
In the early days of administrative law, organic statutes giving agencies capacious power to effectuate broad policies often complicated judicial review. The National Labor Relations Act (NLRA), for example, frames the Board’s remedial authority in broad terms. Section 10(a) “empowers]” the Board “to prevent any person from engaging in any unfair labor practice.” 29 U.S.C. § 160(a). Section 10(c) further “authorizes the Board to require persons found engaged or engaging in unfair labor practices ‘to take such affirmative action ... as will effectuate the policies of this [subchapter].’ ” Va. Elec. & Power Co. v. NLRB, 319 U.S. 533, 539, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943) (quoting 29 U.S.C. § 160(c)).
Fortunately, however, the American people eventually added an important condition to the administrative bargain: the Administrative Procedure Act (APA). “[F]ramed against a background of rapid expansion of the administrative process,” the APA was meant to act as “a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.” Perez v. Mortg. Bankers Ass’n, — U.S. -, 135 S.Ct. 1199, 1211, 191 L.Ed.2d 186 (2015) (Scalia, J., concurring) (quoting United States v. Morton Salt Co., 338 U.S. 632, 644, 70 S.Ct. 357, 94 L.Ed. 401 (1950)); see also 92 Cong. Rec. 2149 (1946) (statement of Sen. McCarran) (describing the APA as a “bill of rights for the hundreds of thousands of Americans whose affairs are controlled or regulated ... by agencies of the Federal Government”). The APA thus proscribes administrative action that is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706.
*243 II.
Before examining the Board’s decision to direct a second election in this case, however, I consider the court’s power to review that decision. A few years after the passage of the NLRA, the Supreme Court held that the Act “indicates a purpose to limit the review afforded [under the NLRA’s judicial-review provisions in Sections 10(e) and 10(f) ] to orders of the Board prohibiting unfair labor practices.” Am. Fed’n of Labor v. NLRB, 308 U.S. 401, 409, 60 S.Ct. 300, 84 L.Ed. 347 (1940). The Court concluded that, because the Board’s decision to direct an election is “but a part of the representation proceeding,” that decision is not subject to judicial review under Section Í0(f). NLRB v. Int’l Brotherhood of Elec. Workers, 308 U.S. 413, 414, 60 S.Ct. 306, 84 L.Ed. 354 (1940). By withholding jurisdiction from the courts of appeals “until the Board issues an order and requires the employer to do something predicated upon the result of an election,” NLRB v. Falk Corp., 308 U.S. 453, 459, 60 S.Ct. 307, 84 L.Ed. 396 (1940), the Court followed legislators’ perceived intent: to allow employees to vote on union membership before facing possible judicial interference. Am. Fed’n of Labor, 308 U.S. at 409-11 & n. 2, 60 S.Ct. 300. It subsequently reiterated that Congress intended to avoid “dragging [the case] on through the courts” before giving employee democracy its chance. Boire v. Greyhound Corp., 376 U.S. 473, 477-79, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).
Decisions of the courts of appeals, including some in the Fourth Circuit, have expanded this Supreme Court precedent to mean that, even when a first election has already been held, “the Board’s direction of a new election is not a final order reviewable under either section 10(e) or section 10(f) of the NLRA.” See, e.g., Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB, 253 F.3d 19, 22, 24-25 (D.C.Cir.2001) (refusing to consider petitioner’s challenge to the Board’s second-election .order even though the Board’s unfair labor practice determinations were “utterly without merit”); Low Kit Min. Co., 3 F.3d at 729-30 (holding a second-election order “not final under the Act and ... not ripe for judicial review”).
According to this view, then, a company may obtain judicial review of a Board’s second-election order only by navigating an unusually circuitous course. First, the company must submit to a second election.Next, assuming the union wins that election, the company must refuse to bargain with the union. This refusal will then give the Board the opportunity to find that the company has engaged in an unfair labor practice. And this determination, at long last, will provide the predicate for judicial review of the Board’s order. On appeal, the company may defend its refusal to bargain by claiming that the second election was unnecessary. See Heartland Human Servs. v. NLRB, 746 F.3d 802, 805-06 (7th Cir.2014).
The courts of appeals, however, should have jurisdiction to review a Board’s direction of a second election when that direction is but the remedial portion of the Board’s final order. I say this for two reasons. The first involves the earlier Supreme Court decisions. The second involves the text of the NLRA itself.
First, none of the earlier Supreme Court cases dealt with the particular question of an election already conducted and a Board order addressing the conduct of that election and any associated remedies. See Am. Fed’n of Labor, 308 U.S. at 402-03, 60 S.Ct. 300; Int’l Brotherhood of Elec. Workers, 308 U.S. at 414, 60 S.Ct. 306; Falk, 308 U.S. at 459, 60 S.Ct. 307. The legislative concern motivating the Court in these cases — that jurisdiction over elec *244 tion-related orders would allow courts to interfere with the Board’s certification proceedings before employees even have a shot at voting — applies with significantly less force after a first election has already been held.
Indeed, a recent Fifth Circuit case declined to extend those decisions to the decertification election context. NLRB v. Arkema, 710 F.3d 308, 319 (5th Cir.2013) (denying “enforcement of the order setting aside the election and requiring a new one”); see also Graham Architectural Prod. Corp. v. NLRB, 697 F.2d 534, 545-46 (3d Cir.1983) (Garth, J., dissenting) (arguing for judicial review of second-election orders in the certification context). And even in decisions declining to review the Board’s second-election order, courts have noted, almost apologetically, that their decision not to do so flies in the face of judicial efficiency. See, e.g., Graham Architectural Prod. Corp., 697 F.2d at 543 (“[Cjonsiderations of efficiency and judicial economy seem to suggest that we review the election order as well.”).
Secondly, the text of the NLRA itself plainly does not bar judicial review in these cases. The text provides simply that review lies where a “final order” of the Board has issued in regard to any unfair labor practice. 29 U.S.C. § 160(f). The statute also speaks remedially. We are empowered to rule on' any final order granting in whole or in part “the relief sought.” Id. Here, a final order of the Board has indeed issued. The Board found that Intertape’s pre-election activity involved unfair labor practices under Section 8(a), and based on this determination, the Board ordered a new election. But the remedial components of the Board’s order are not something separate and apart from its findings as to liability. Here, the Board’s Order notes that “the election held on April 26 and 27, 2012 ... is set aside,” and then proceeds on the very same page recounting the alleged unfair labor practices to direct a second' election and set forth the conditions for holding it. J.A. 681; Intertape Polymer Corp., 360 NLRB No. 114, 2014 WL 2192498, at *4 (May 23, 2014). The date of the order and the signatures of those Board members ascribing to it follow right on the heels of the above. J.A. 681. The Board ostensibly “sever[s]” its direction of a new election from the rest of its disposition. J.A. 681. But this boilerplate severance sentence is hollow formalism, and the Board’s own Statement of Jurisdiction commendably recognizes as much. It refers to its “Decision, Order, and Direction of Second Election issued May 23, 2014” as a “final order with respect to all parties.” Resp. Br. 1-2.
This is one, single final' order. Why artificially segment it? Nothing in the text of the NLRA permits us to salami-slice the Board’s order, and the most basic factors of efficiency and economy suggest that we review the underlying order — both the unfair labor practices and the remedial prescriptions- — -in its entirety.
This is especially the case where, as here, we have reviewed and found wanting the most critical finding underlying the Board’s direction of a new election. With the underpinning of the Board’s order thus removed, it is appropriate to deal with the matter in its entirety. I do not think the sparse language of the NLRA forbids judicial review; quite the contrary. By simply referring to a final order as a unitary whole it suggests that review would be permitted. Indeed, the statute plainly empowers courts of appeals to “enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board.” 29 U.S.C. § 160(e), (f).
*245 One overarching point remains. Surrendering judicial review of a Board’s do-over election order severs the historically interwoven concepts of violation and remedy. It likewise severs labor law from a foundational principle of administrative law: arbitrary and capricious review under the APA. The arbitrary and capricious standard defines as much as anything the relationship between courts and agencies in our country, and to relinquish or dilute that standard tilts the balance too emphatically in favor of the administrative state and against the check and balance of judicial review. The Board’s new election order was a remedial step intended to cure Intertape’s violations of the NLRA. But a remedial order constitutes an agency action that is no less (and often more) susceptible to agency caprice than is an agency finding of liability.
“The Supreme Court has always assumed that Congress intended the judicial review provisions of both [the APA and the NLRA] to be equivalent,” and it “has read the NLRA as if it included an arbitrary and capricious test.” Diamond Walnut Growers, Inc. v. NLRB, 113 F.3d 1259, 1266 (D.C.Cir.1997) (en banc) (citing Universal Camera v. NLRB, 340 U.S. 474, 487, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Linden Lumber Div., Summer & Co. v. NLRB, 419 U.S. 301, 309-10, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974)). One need not ascribe independent jurisdictional force to the APA in order to note that the guiding principles of administrative law — arbitrary and capricious review under the APA— should provide the overall perspective from which courts assess their authority. “[I]t is, of course, the most rudimentary rule of statutory construction ... that courts do not interpret statutes in isolation, but in the context of the corpus juris of which they are a part, including later-enacted statutes.” Branch v. Smith, 538 U.S. 254, 281, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003). The Supreme Court’s 1940 cases, which some later courts wrongly extended, were decided without the benefit of the APA. Given that those 1940 decisions are likewise distinguishable from cases involving re-run (not initial) elections, it needlessly eviscerates the purpose of administrative procedure under the APA to extend them further.
Courts must remain mindful of the real jurisdictional limitations on our reviewing role under the NLRA. See, e.g., Low Kit Min. Co., 3 F.3d at 729-30. We have been careful to respect the Board’s management of representation proceedings where warranted. See e.g., Perdue Farms, Inc. v. NLRB, 108 F.3d 519, 521 (4th Cir.1997). Here, however, we consider the impact of the APA on the NLRA jurisdictional provisions in a case where an election has been held and the Board’s finding underpinning a second-election order has been overturned. Our duty is to deny enforcement to those remedial directives that are “arbitrary, capricious,” or contrary to law, 5 U.S.C. § 706, and that are indistinguishably part of Board final orders concededly ripe for review, 29 U.S.C. § 160(f). I therefore turn to the question of whether the Board’s second-election order here was arbitrary and capricious.
III.
Ordering a new election after the first contest’s landslide results, and on account of comparatively minor company violations, overstepped the Board’s remedial discretion. First, more carefully tailored remedies could adequately address any illegitimate conduct without forcing a second election unlikely to yield a different result. Second, the Board’s order both departs from Board precedent focusing on whether a given error actually affected an election’s outcome and relies on a harmless error *246 rule that, when applied as it was here, is far out of proportion to the harm it protects against.
A.
Intertape’s employees voted 142-97 • against the union, a margin of 45 votes, or almost 19%. By way of comparison, no presidential candidate has won a more lopsided share of the popular vote since Nixon defeated McGovern in 1972. See Leip, David, United States Presidential Election Results, David Leip’s Atlas of U.S. Presidential Elections, www.uselectionatlas.org/ RESULTS/ (last visited Aug. 24, 2015). Surely marginal company infractions should not undermine this election result.
Here, we hear only three minor complaints. First, an Intertape supervisor allegedly approached a single employee and asked about his union sentiments. But this “interrogation” occurred before the critical period, and the Board rightly did not rely on it when ordering a new election. J.A. 680. Next, Intertape expedited “the cleanup of a break room that, at most, involved the removal of certain material for several hours on 2 days approximately 1 month before the election.” J.A. 682; Intertape Polymer Corp., 360 NLRB No. 114, at *3 (Member Misc.marra, dissenting). Finally, Intertape conducted a leaf-letting campaign simultaneous with a similar union campaign. The Board found that this parallel leafletting constituted unlawful surveillance of union activity. J.A. 679-80.
This last charge — that Intertape unlawfully surveilled its employees while leaflet-ting — is particularly problematic because, as the court notes, it gives short shrift to Intertape’s own free speech rights. Inter-tape’s right to express its views on union membership to its employees is protected by the First Amendment. Chamber of Commerce v. Brown, 554 U.S. 60, 67, 128 S.Ct. 2408, 171 L.Ed.2d 264 (2008); see also Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 386, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) (Rehnquist, C.J, concurring and dissenting) (“An employer’s free speech right to communicate [its] views to [its] employees is firmly established and cannot be infringed by a union or the Board.”). The Board found unlawful surveillance because Intertape supervisors do not typically communicate with employees by leafletting at the plant gate; that they did so was “out of the ordinary.” J.A. 679. But elections are themselves “out of the ordinary” — that Intertape does not resort to leafletting for day-to-day personnel communications cannot be used as a reason to muzzle the exercise of free speech when campaign season arrives.
To hold broadly that simultaneous leaf-letting involves unfair supervisory surveillance of employees overlooks the fact that elections of all sorts involve simultaneous communication of competing points of view. It also confers upon a union a veto power over employer speech at prime times and on critical days. Chief Judge Traxler. has put the point well: “by accepting [the General Counsel’s] argument, the Board is effectively requiring employers to cease engaging in protected conduct whenever union supporters choose to engage in identical, protected conduct alongside them.” Maj. Op. at 240.
In any event, these alleged infractions could not have forced the hands of 45 adult employees, the large margin by which the union lost. I agree fully with the Board that the employer had no right here to expedite its so-called “clean up” and remove the union materials from the break-room. But dozens of thinking employees did not vote differently because of a premature cleanup of a breakroom weeks before the election. Nor did the risk of accepting a leaflet within view of a supervi *247 sor plausibly scare so many workers from expressing their true beliefs via secret ballot. The NLRA “does not require the Board to treat employees as if they were bacteria on a petri dish that must be kept free of contamination.” NLRB v. Lovejoy Indus., Inc., 904 F.2d 397, 402 (7th Cir.1990). The Board’s ultra-sanitized approach gives too little weight to the jockeying inherent in any election and too little credit to employees’ capacity for independent thought.
Requiring a new election, moreover, may impose real costs on employer and employee alike. A second election distracts both from their work, may risk damage to joint morale, and absorbs considerable time and resources. And the results of any do-over election would quite possibly be contested and litigated as well. Where does it all end? There are of course instances where the employer will abuse its very position as employer and render elections something other than the product of free choice. There will of course be situations where the result of an election will be fatally compromised by unfair labor practices, but this was not one of those, and the Board’s remedial order revealed an insensitivity to the burdens that agency actions can impose upon those companies who possess but limited recourse to check official overreach.
None of this is to say that properly proven infractions should be left uncorrected. But the power to remedy comes with the responsibility to issue an appropriate remedy. The Supreme Court has instructed federal courts, for example, that a “grant of jurisdiction to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances.” Tenn. Valley Auth. v. Hill, 437 U.S. 153, 193, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944)). Accordingly, it has rejected mechanical rules mandating injunctive relief. See, e.g., eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 393-94, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (rejecting the Federal Circuit’s general rule requiring a permanent injunction against a patent infringer upon a finding of infringement absent exceptional . circumstances). It has instead espoused the commonsense notion that “the nature of the violation determines the scope of the remedy.” Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). When it has recognized possible liability, the Court has been careful to instruct that “[rjemedial orders ... should concentrate on the elimination of the offending practice.” Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., — U.S. -, 135 S.Ct. 2507, 2524, 192 L.Ed.2d 514 (2015).
If federal courts can leaven their remedial powers with a dose of proportionality, administrative agencies can too. It does not take agency expertise to determine that landslide election results are not altered by insubstantial infractions. Here, the Board could have pursued a more proportionally tailored remedy by, for example, finding the employer at fault and requiring it both to cease and desist from its unfair labor practices and to post the Board’s cease and desist order in “conspicuous places.” See, e.g., Flamingo Las Vegas Operating Co., 360 NLRB No. 41, 2014 WL 559058, at *6-7 (Feb. 12, 2014) (finding a cease and desist order to be an adequate remedy and declining to order a new election). Here, such an order would draw attention to the misconduct without the unnecessary dislocations of another election.
B.
The Board’s direction of a new election was also inconsistent with its own past *248 practice. Previous Board decisions have inquired more thoroughly into whether any misconduct actually affected the election’s outcome. Some do follow the stringent harmless error rule of Super Thrift Markets, Inc., which requires a new election unless it is “virtually impossible to conclude that [misconduct] could have affected the results.” 233 NLRB 409, 409 (1977). See, e.g., Longs Drug Stores Cal., Inc., 347 NLRB No. 45, 2006 WL 1810612, at *5 (Jan. 28, 2006) (holding it “virtually impossible” for isolated, misconduct to have affected a “wide margin” of votes).
Other cases, however, apply a more searching multi-factor inquiry, considering among other things the “proximity of the misconduct to the election” and the “closeness of the final vote.” FJC Sec. Servs., Inc., 360 NLRB No. 6, 2013 WL 5703601, at *9 (Oct. 18, 2013) (citing Taylor Wharton Din, 336 NLRB 157, 158 (2001)). No matter which standard it invokes, however, in many of its past cases the Board has determined that it will not order a new election where misconduct does not materially affect election results. In Clark Equipment Co., for example, the Board found that an employer’s misconduct could not have “affected the results of the election,” because with a tally of 391 for, and 489 against the union (a result less lopsided in percentage terms than that in this case) the election “[could not] be characterized as close.” 278 NLRB 498, 505 (1986).
The Board did not invoke any particular standard when it ordered a new election here, asserting only that the infractions at issue “cannot be trivialized as isolated or de minimis.” J.A. 680. This terse analysis, however, resembles a strict application of the “virtually impossible” standard — one that departs from past cases’ more realistic examination of whether any misconduct had a likely effect on election results.
A stringent “virtually impossible” standard could well be the most exacting harmless error rule in all of American law. Compare the Board’s rule with some other well-known rules. A person may go to prison for life, for example, after a violation of his federal rights so long as a court can say “with fair assurance” that “the judgment was not substantially swayed by the error.” Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). An individual may receive that same sentence even after a violation of his constitutional rights so long as a court is “able to declare a belief that [the violation] was harmless beyond a reasonable doubt.” Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). That the Board’s intolerance of marginal NLRA infractions is greater than that of courts for error in criminal trials is unsettling.
Ordering a new election is likely to be arbitrary and capricious whenever the underlying infraction did not materially affect the first election’s results. What could be more capricious, after all, than an order to redo a costly process without good reason to believe that the result will be any different the second time around? This commonsense notion may explain why many courts, including this one, have often referred to a standard of materiality when overruling objections to Board-certified elections. See, e.g., NLRB v. Herbert Halperin Distrib. Corp., 826 F.2d 287, 290 (4th Cir.1987) (holding that an employer seeking to set aside an election bears the “heavy burden” of showing that infractions “materially affected the election results”); Bridgeport Fittings, Inc. v. NLRB, 877 F.2d 180, 188 (2d Cir.1989) (holding that “the Board did not abuse its discretion in failing to set aside [the union’s victory in an] election” because “the failure ... did not affect the outcome of the election”). It *249 is unclear why the Board should not also use a standard of materiality and certify an election which was fundamentally fair, even if not impeccably perfect. This is a neutral standard; neither an employer’s nor a union’s marginal infractions under the NLRA should be grounds for overturning an election if the election proceedings in their totality were fair.
IV.
The Board is “vested with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees.” NLRB v. Ky. Tenn. Clay Co., 295 F.3d 436, 441 (4th Cir.2002). But courts must not “rubber stamp” Board decisions — they can and must step in when the Board goes “beyond what good sense permits.” Comcast Cablevision-Taylor v. NLRB, 232 F.3d 490, 495 (6th Cir.2000). In this case, the Board’s action ran counter to a prime objective of our labor law — that of supporting employee democracy. The Board’s decision to order a new election on the basis of minor violations at worst, and under a shifting and unreasonably stringent harmless error rule, failed to honor the fact that the employees in this company made a clear choice as to union representation. One would have thought the verdict of these workers might have been respected.
I end where I began. I join the court’s opinion. The precedent of our circuit does not allow a Board re-run election order to be judicially reviewed at this juncture. It is, of course, much to be hoped that the Chief Judge’s conscientious review of the Board’s underlying unfair-labor-practice findings will cause the Board to withdraw its election re-run order on its own, but, in the absence of a court direction, that is by no means assured. Still, the workers’ vote should matter; the employer should not have to undergo an election do-over; the court should not have to await some speculative alleged refusal to bargain under Section 8(a)(5), having in the interim engaged in but piecemeal review and performed what in essence would be a pointless exercise.
What we have before us is a snapshot of an area in which the balance between courts and agencies is simply out of whack. None of this means the Board’s role in labor relations is to be devalued or its findings paid less deference, for indeed, its interrogation and confiscation findings in this very appeal were and should have been upheld. But administrative overreach was also on display here. If not in this case, then in some other, Supreme Court evaluation of the timing and extent of court of appeals review of Board second-election orders might be a helpful thing. Helpful, I think, if the benefits and burdens of the administrative state are finally to be reconciled.